Some of the increment may have accrued during the years before the franchise tax act became a law. As the relator never declared any dividends, and annually paid its franchise tax after 1880 upon the basis of the actual "value in cash" of its capital stock, we may assume that whatever increment there was above the par value of the capital stock entered into the basis upon which the franchise tax was annually levied. It cannot be assumed, under the circumstances, that the relator omitted to declare annual dividends, or to declare this surplus as a dividend earned, in order to evade taxes, under this act, within the hypothetical case supposed in People v. Albany Ins. Co., 92 N. Y. 458. We think the comptroller erred in assuming the surplus distributed above the authorized capital stock to be a dividend made or declared. The relator consents to a tax upon the basis of the actual cash value of its 250 shares of stock as reported by it. The tax, upon that basis, would be $63.75.

Determination of the comptroller modified by reducing the tax to $63.75, and as so modified confirmed, with costs to the relator. All concur.

----

(40 App. Div. 429.)

## In re LEVENTRITT.

(Supreme Court, Appellate Division, First Department. May 5, 1899.)

1. ASSIGNMENTS FOR BENEFIT OF CREDITORS—PRIVATE SALE OF ASSETS— ASSIGNEE'S DUTIES.

     While an assignee for the benefit of creditors may sell the assigned property at public or private sale at his discretion, unless limited by the assignment, if he sells at private sale he is bound to show that he acted in good faith and exercised the care of an ordinarily prudent business man, and sold for the best price obtainable.

2. SAME—COLLUSIVE SALE—LIABILITY OF ASSIGNEE.

     Property worth over $15,000 was assigned to an assignee for the benefit of creditors. An inventory was made shortly thereafter, which, disregarding certain trimmings, placed the value of the stock at $11,200. The assignee, acting in collusion with the assignor and his wife, though requested by a creditor holding nearly two-thirds of the total liabilities, refused to sell the stock at public sale, and, after receiving a small number of bids, which he refused to disclose to such creditor, sold the stock to the assignor's wife, as of the date of the assignment, for $9,475, giving her a credit of $907 for goods sold in the meantime, though not charging her with the expenses of such sales, which amounted to over $700. *Held*, that the sale was not made in good faith, nor with reasonable care, and that the assignee should be charged in his account with the actual value of the goods.

3. ASSIGNEE'S ACCOUNT SURCHARGED WITH UNREPORTED COLLECTIONS.

     Where, after objections were made to an assignee's report, he filed a supplemental statement, from which it appeared that the amount of collections had been understated, and no reason was given for the error, his account was properly surcharged with the difference.

4. SAME—ATTORNEY'S FEES.

     Where an attorney for an assignee for the benefit of creditors acted in collusion with the assignor's wife, and rendered no other service except the preparation of the assignment, and was grossly negligent in failing to properly defend an unfounded and fraudulent claim by the wife against the assignee for back wages, set up to cover the amount of the purchase price of the assigned property, privately sold to her by the assignee under the attorney's direction, a payment of $1,000 to him for attorney's fees was disallowed the assignee on the settlement of his accounts.

**5. SAME—FRAUDULENT CLAIMS—ALLOWANCE.**
　　Where the wife of an assignor for the benefit of creditors, after having purchased the assigned estate, by collusion with the assignee and his attorney, filed a claim against the estate for back wages nearly equal to the purchase price, and by failure of such attorney to properly defend the claim obtained judgment therefor against the estate, the assignee was properly disallowed credit for such judgment on the settlement of his accounts.

**6. SAME—FRAUDULENT ADMINISTRATION—COMMISSIONS DISALLOWED.**
　　Where an assignee for the benefit of creditors failed to administer the estate in good faith, but permitted his business partner to collude with the assignor's wife to establish a fraudulent claim against the estate, and by collusion enabled her to purchase the stock for much less than its value, such assignee is not entitled to commissions.

Appeal from special term, New York county.

Final accounting of George M. Leventritt, as assignee for the benefit of creditors of Herman F. Bindseil. From an order affirming a report of a referee appointed to settle said accounts, Joseph Ullmann, a creditor, appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

A. J. Simpson, for appellant.
Charles Strauss, for respondent.

RUMSEY, J. On the 30th day of November, 1896, Herman F. Bindseil made an assignment for the benefit of his creditors to George M. Leventritt, the respondent in this matter. The assignee qualified on the next day, and the assignment and schedules were filed at the same time. Late in the afternoon of December 1st the assignee took possession of the store. He continued in possession of the store and the goods, collecting the accounts and selling the goods until the 22d day of December, 1896, when he made a sale of all the stock to Sophie F. Bindseil, the wife of the assignor. The goods were delivered to her in pursuance of the agreement of sale. After the sale, the assignee continued to collect the accounts, and on the 17th of January, 1898, he made out his account as assignee, presented it to this court, and obtained a citation to the creditors to appear and attend an accounting. At that time the appellant, Joseph Ullmann, who owned nearly two-thirds of the total liabilities of the estate, appeared, and filed certain objections to the accounts. A referee was appointed to state the accounts, who made his final report, which, upon a hearing, was confirmed by the court, and from the order confirming it this appeal is taken.

The several objections taken by the appellant will be considered in their order.

By the first objection the creditor seeks to surcharge the account of the assignee by adding to it what he should have received for the stock of merchandise which came into his possession. It is claimed by the creditor that the sale of the stock, which was made to Sophie F. Bindseil, was made in the interests of the assignor, and for the benefit of his wife, and against the wishes of Ullmann, and under his protest, and that the assignee did not procure for that stock the best price that he could. This contention was overruled by the referee. Bindseil was a dealer in fur garments, and the stock of goods which

was transferred to the assignee consisted of furs and garments fin-
ished, and in various stages of completion, of the nominal value of
$28,842, but actually worth $15,898.22, as shown by the schedules.
The assignee took possession of the store late in the afternoon of
December 1st. It was opened again the next morning, and sales at
retail were made of the stock. Nominally the business was in charge
of the assignee, who says that he visited it two or three times daily,
but practically, as it is to be inferred from all the evidence, the whole
matter was left in the control of Bindseil and his wife, assisted by the
same persons who had been in the Bindseils' employ before the assign-
ment. Shortly after the assignment was made, Ullmann, whose advice
had been asked by the assignee as to the manner of sale of the stock,
made a careful inventory of it. He is a dealer in furs, and well ac-
quainted with their value. In making that inventory, he estimated
only the value of the furs which were in the store, and which had en-
tered into the making of the garments, disregarding the trimmings
and linings and the work of making the garments, and upon that
basis he fixed the actual value of the stock of goods at $11,200. This
inventory was made four or five days after the assignment. Mr. Ull-
mann was insisting upon an early sale of the goods, for the reason that
it was expensive to continue in the occupation of the store, with the
considerable number of people who seem to have been employed in it,
and for the reason, besides, that the month of December was espe-
cially the season for the sale of goods of that kind, and they would be
apt to realize much better prices if then sold than if the sale had been
delayed. In this matter the assignee seems to have agreed with him,
and he says that he made efforts to sell the goods during the month
of December, calling attention of various people to the fact that he
had such a stock of goods for sale, and asking them to make an offer
for their purchase. He says that he received an offer of about $5,000
for the goods from Ehrich Bros., who were dealers in that class of
merchandise. Whether that offer was the result of a previous ex-
amination of the goods by Ehrich Bros. or not, he does not know.
He also says that he received offers from two other persons; but
he is unable to state the amount of either one, or the time when he
received the offer. So far as appears, these three offers were all
that he had for the goods, and he made no effort to obtain any fur-
ther offer from any one, except by writing to certain persons advising
them of the fact that he had such goods for sale. Ullmann, after hav-
ing made his estimate of the value of the goods, offered $8,500 as of
the time of the assignment. He was told, in reply to that offer, that
another person had bid $500 more. When he asked who the other
person was, the assignee refused to tell him; nor could he get any
further information in regard to the matter, except a general state-
ment that a larger bid than his had been made. When he was asked
to make a further bid for the goods, he replied that the goods should
be put up at auction, so that all persons who desired to buy could
be confronted with the bidders, and he refused any longer to be a
party to a blind auction, such as the assignee said that he was carry-
ing on. In fact, there seems to have been no bidder except Ullmann
and the unknown person who was said to have offered $500 more than

Ullmann did, and as a result of the whole transaction the property was said to have been sold to Mrs. Bindseil on the 22d of December, 1896, at a private sale, for $9,475, as of the date of the assignment. The effect was that she received the benefit of all the sales which had been made from the time of the assignment down to the time of the alleged sale to her, and was called upon to pay the difference between the amount of those sales and $9,375, which in some way was fixed at $8,467.31; making the nominal amount of sales credited to her something over $907. How this amount was reached, does not precisely appear, because it is stated that the total amount of the goods sold at retail from the 1st of December to the 22d of that month was something over $1,298. But this discrepancy is comparatively immaterial. The important matter is that Mrs. Bindseil received upon her bid a credit for $907, as the proceeds of goods sold during the month, and was not charged, or did not pay, the expenses of those sales, so that substantially the assignee gave to her, in addition to the goods, the expense of making the sales of which she had the proceeds. That expense was not inconsiderable. It seems, from the statement furnished by the assignee, that the total expenses of administering the trust down to the time of making his account were $3,141.79. Among the items for those expenses were attorney's fees, $1,000; rent, $833.33; wages preferred, $271.94. This item of wages preferred represents undoubtedly the amount of the wages which were due to the employés at the time of making the assignment, and it is fair to assume that it represents all of the wages then due. In addition to that, it appears that the assignee paid wages to the amount of $664.35, and that the miscellaneous expenses were something over $372. More or less of those expenses were caused by keeping open the store during the month of December; but just how much, it is impossible accurately to say. But the expenses in wages alone of selling goods to the amount of $1,298 was $664.35, and it is fair to assume, from an examination of the account, that the other expenses of running the store during that time were not less than $100. Therefore $764 was the actual cost of selling the goods at retail during the month of December, and of this actual cost Mrs. Bindseil, upon her purchase, received the benefit of at least $400, so that, as the net result of the transaction of the sale of these goods, of which the actual value was nearly $16,000, the assignee received $8,467 in cash from Mrs. Bindseil, $1,298 from cash in retail sales, which he had made at an expense of about $765; making the total net result of his administration of affairs that he received for the stock about $8,000, which could be devoted to the payment of the creditors, while the actual gross receipts for the stock were only $9,765.31. In view of the fact that the actual value of this stock, as fixed by the assignor, was nearly $16,000, and the actual value of the skins that went into the garments was over $11,000, it is not strange that all the creditors, except Mrs. Bindseil, should be dissatisfied with this result. It is said, however, that Mrs. Bindseil also agreed to pay the rent for November, which had not been paid, but which was not due until the following February. Leventritt says that he paid the rent for the month of December, during which he occupied the store, and which amounted

to $833.33, but which also was not due until February. The net effect of the whole transaction, however, was that Mrs. Bindseil received the benefit of the sales of the goods during the month of December, for which Leventritt paid the rent, and she gave him in return an agreement to pay the rent for the month of November. It is not perceived precisely how the estate obtained any particular advantage over Mrs. Bindseil by this transaction, and no account therefore will be taken of it. The rent for the month of November was probably a charge against this estate; but, if the goods were sold as of the time of the making of the assignment, no reason is perceived why the person who bought the goods as of that time should not have deducted from the receipts to be credited to her all the expense of selling them, which would include the rent for the month as well as the items of wages. The agreement to pay the rent for the month of November operated precisely as though she had deducted the amount of the rent from the receipts of the sales, and worked no advantage to the estate; nor did it take from her anything more than she ought to have paid if she made the purchase as of the 1st of the month. It is therefore just that this amount of rent should not be taken into consideration; but the result of the transaction is, as stated before, that the goods of the actual value of nearly $16,000 netted to the estate only about $9,000.

That the assignee has the right to sell at public or private sale, in his discretion, if that discretion is not limited by the assignment, cannot be denied. Burrill, Assignm. (4th Ed.) 618, 619; 3 Am. & Eng. Enc. Law (2d Ed.) 114. But the assignee is bound, in the conduct of the assignment, to use the care of an ordinarily prudent man in his own business, and if, through his bad faith or carelessness or negligence, a loss results to the estate, he must answer for it. Litchfield v. White, 3 Sandf. 545, affirmed 7 N. Y. 438, 443; In re Cornell, 110 N. Y. 351, 18 N. E. 142. When he is brought to an account of his transactions as assignee, he is bound to make it appear that he used in his sales the care and skill of an ordinarily prudent business man. He claims here that he sold these goods for the best amount that he could obtain. This is denied by Ullmann. The sale was practically a private sale. Although it is said that there was bidding, yet it is quite clear that there was no substantial competition. If Mrs. Bindseil did bid, which is not by any means certain, no one was aware of it except the assignee, and there was nothing in the circumstances of the transaction which would tend to induce any person who desired to buy these goods to advance his offer beyond the first one that he made, to prevent the purchase of the goods by some competing buyer. The assignee undoubtedly wrote to several persons, advising them that he had these goods for sale. He claims that he received three offers for them before Ullmann made any proposition to buy. One of these was from Ehrich Bros., and was about $5,000. He cannot tell the amount of the others, nor the dates when they were made; nor does he seem to be by any means sure as to the fact that he actually received offers from anybody else. The offer of Ullmann for $8,500 was apparently the only one made in good faith, except the small one of Ehrich Bros. The way in which it was received

shows quite clearly that there was no intention on the part of Leventritt to permit Ullmann to buy this property, if he could prevent it. When Ullmann was told that another person had bid a greater sum for this property, he was justified in his endeavors to ascertain who it was, and he ought to have been told; and the fact that Leventritt refused to tell him, coupled with the further facts which will be referred to, showing a complicity at least with Mrs. Bindseil, furnishes· more than an inference that in this whole transaction the effort was not to sell these goods for the best price that he could obtain, but to so manipulate the transaction as to allow Mrs. Bindseil to become the buyer of these goods at a small price. The largest creditor was justified in insisting that what was done in this matter should be done openly and above board, and that, if a private sale was to be made, the negotiations for it should have been made in such a way as to afford a certainty that as good a price was obtained as was possible to be done, and that, if the goods were to be sold at auction, the auction should be an open one, where each person who desired to buy should be face to face with every other buyer. Neither of these things took place. The transaction with Mrs. Bindseil was concealed from everybody else. The relations of the assignor and his attorney with her in this business were clearly such as to throw suspicion on all the transactions, and, as the result of the whole case, we are quite clear that the assignee did not use ordinary skill and good faith in the sale of these goods to her, but that he permitted her to have them for much less than they were worth, and that his accounts should be surcharged with what shall be found to be the actual value of the goods. What that shall be seems to us best, upon the whole, to be submitted to another referee. It might not be fair, upon the evidence as it stands here, to charge the assignee with the actual value as shown in the inventory, and clearly the value as fixed by Ullmann is much less than the actual value of the completed goods, and for that reason we are not satisfied, upon the evidence, to fix the amount of the surcharge of the account.

The next objection is to that schedule which states the amount of the accounts collected. This needs but little examination. The assignee made a supplemental statement by which he seems to have conceded that the amount of collections stated in Schedule B was $475.17 less than the true amount, and his account was surcharged with that amount by the referee. The supplemental account does not appear to be in the record, and the reason why he understated the amount of his collections in the original account does not appear. Therefore it is not necessary to say anything more about it.

The objection to the expenses charged in the account should be considered. The largest item is that of $1,000, paid to the partner of the assignee for attorney's fees. It is proper to say that the attorney referred to is not the gentleman who appears in this case as counsel for the assignee. It appears from the testimony that a large portion of this charge was made for services claimed to have been rendered in an action brought by Mrs. Bindseil against the assignee personally for services rendered to the assignor before the assignment. The facts of this action are so unique as to require a

little examination, because it will throw light, not only on the value of the attorney's services, but upon the motive which governed both the attorney and the assignee in this whole transaction. Mrs. Bindseil appeared in the schedules as a preferred creditor to the amount of something over $2,800 for wages. At about the time when she was negotiating this purchase for $8,400 in cash, she seems to have conceived the idea of increasing the amount of her claim so that it would be about equal to the amount of money which she was to pay for the goods. She made a claim for that amount to the assignee, which he very prudently rejected. Thereupon she sued him for it. The case came on for trial on the 20th of April, 1897; the partner of the assignee appearing as his attorney. It is very clear that there was no cause of action whatever against the assignee, and it is impossible to conceive that any could have been alleged upon the facts as they appear, without the commission of rank perjury on the part of Mrs. Bindseil. Clearly none was shown upon the trial. She testified as to the facts upon which she based her claim to recover, and was cross-examined by the counsel for the defendant. At the close of the plaintiff's case the counsel for the defendant practically conceded that a cause of action was made out, and that he had no defense, and the court therefore ordered a verdict for the amount of Mrs. Bindseil's claim, which was about the amount which she was to pay in cash for these goods. Although it was perfectly clear that there was no possible cause of action against this assignee, and the court would undoubtedly have dismissed the complaint had it been requested to do so, yet the attorney for the assignee not only made no motion in that direction, but substantially conceded that the plaintiff was entitled to recover. No request was made for a verdict by defendant's counsel; nor was any exception taken to the direction of the court that a verdict should be rendered in favor of the plaintiff. The attorney for the defendant can only be excused from gross ignorance in the conduct of this case upon the theory that he or his client, or both of them, were in collusion with Mrs. Bindseil to permit her to recover this judgment against the estate. Whether he was ignorant or dishonest in the matter, it is perfectly clear that he utterly failed in his duty to defend this assignee against this large claim which was made against him, without a shadow of a right either in law or in fact, and certainly his negligence in this regard was so gross that he should not be permitted to recover one cent for his services in his alleged defense in this case. Nor do we think that there was any ground shown for the payment of any sum to him for counsel fees, except such possibly as might pay him for drawing the assignment, preparing the accounts, and collecting some few of the outstanding accounts which were contested. If he did any other services for this estate, they have not been made to appear in such a way as to warrant the referee in permitting a payment of the sum which the assignee in fact did pay.

As to the other payments there is nothing to show that they were not properly allowed. The claim of Mrs. Bindseil was properly rejected by the referee. It is necessarily to be inferred from what has been said that the assignee did not properly administer this estate.

He permitted his partner to collude with Mrs. Bindseil to establish a large claim against the estate, which had no foundation in law, and clearly colluded with her himself to enable her to purchase this stock for much less than its value. He ·delayed the accounting of the estate for much longer than was necessary.. Such a mode of administration does not commend itself to the court, and it clearly affords good reason why one guilty of it should not have commissions. No foundation is made for charging the assignee with interest upon the funds in his hands.

The result of our examination is that the order confirming this report should be reversed, and the whole matter sent back to another referee·for another examination of the account, in accordance with this opinion, and the costs of the proceedings and of this appeal to abide the final order. All concur.